Estate of S. Glen Vinson, Deceased, Lillian V. Weaver and Stanleigh B. Vinson, Co-Executors v. Commissioner.
Estate of Vinson v. Commissioner
Docket No. 92123.
United States Tax Court
T.C. Memo 1963-70; 1963 Tax Ct. Memo LEXIS 273; 22 T.C.M. (CCH) 280; T.C.M. (RIA) 63070; March 11, 1963
*273 M. R. Schlesinger, Esq., 1401 The East Ohio Bldg., Cleveland, Ohio, for the petitioners. Joseph P. Crowe, Esq., and William O. Allen, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined a deficiency in the petitioner's estate tax in the amount of $450,866.94. The sole issue for decision is what was the fair market value of 428.708 acres of land on November 17, 1956. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. The decedent S. Glen Vinson died on November 17, 1956. A Federal estate tax return was timely filed on February 4, 1958, with the district director of internal revenue, Cleveland, Ohio. On schedule A of the estate tax return, the executors included, as a part of the gross estate of the decedent, 428.708 acres of real estate (hereinafter sometimes referred to as the Vinson property) situated in Madison and Washington Townships, Richland County, Ohio. The value at the date of decedent's death was reported thereon as $157,000, the value set by three appraisers appointed by the Richland County Probate Court. In the notice of deficiency respondent determined *274 that the value of the property was $897,422. The Vinson property consisted of 428.708 acres of land and was located to the southwest of Mansfield, Ohio. Up to the present time, the Vinson property had been used for farming purposes. The property was "T" shaped; however, the horizontal part of the "T" on the right side was somewhat shorter than the left side. The City of Mansfield is essentially oblong in shape. Both the Vinson property and the City of Mansfield run north and south. The vertical part of the "T" extended below the bottom edge of the city limits. In 1956, at its closest point, which was the right edge of the top of the "T", the Vinson property was approximately one-half mile from the Mansfield city limits. There were three roads which were close to the Vinson property. Cook Road was a black-top road that separated the Vinson property into two parts. Running diagonally from northeast to southwest Cook Road ran alongside the lower edge of the right arm of the "T" and cut through the bottom part of the "T". Marion Road was to the north of the Vinson property and ran parallel to the top edge of the "T" on the left side for a short distance. Trimble Road, which ran north *275 and south, was parallel to the end of the top of the "T" on the right side. Trimble Road intersected Cook Road a short distance before Cook Road began to run parallel to the lower edge of the "T" on the right side. Approximately 75 acres (hereinafter referred to as 75 South) of the Vinson property was located south of Cook Road. It has a frontage of 1,668 feet on Cook Road. The topography of 75 South was sloping down toward the south with some small gullies. While this property contained a house and other farm buildings, its highest and best use would be for subdivision purposes. The remaining 353.708 acres of the Vinson property was located on the north side of Cook Road. The eastern half of this acreage, or approximately 178 acres, had a frontage of 2,640 feet on Cook Road and a frontage of 1,344 feet on Trimble Road. The topography of the eastern half was level to rolling with no abrupt changes. The main house and its attendant farm buildings were located in the southeast corner of the aforementioned 178 acres. With the exception of the main house, its attendant buildings and 10 acres of land, the highest and best use for the remaining 168 acres (hereinafter referred to as 168 *276 East) would be for subdivision purposes. The western half of the Vinson property, or approximately 175 acres (hereinafter referred to as 175 West) had a small frontage of 458 feet on Marion Road at its northwest edge. To the west, 175 West faced railroad and industrial property. Its topography was rough. Because of its topography, it would be difficult to develop for homes, or, if developed, it would most likely have to be in larger lots and done in a wasteful manner. The highest and best use of such property would be as marginal farm land.however, at some future time it might be possible to use a part of the land for subdivision purposes. Sewage facilities would have been a problem in trying to develop the Vinson property. The City of Mansfield had been cited several times by the state health authorities for its inadequate sewage system. Public sewage facilities were only available within the Mansfield city limits. In the outlying areas, community sewage systems and septic tanks were available; however, these alternatives were not always feasible. It was necessary to have someone, such as the county, take over and operate a community system. At times, this was a difficult task. *277 In order to use septic tanks, fairly large lots had to be available. The use of septic tanks was further limited by the fact that some land, regardless of size, was not suited for their use. Even when used, septic tanks began to be troublesome after approximately five years. Water facilities would also have created somewhat of a problem in trying to develop the Vinson property. Although there was a twenty-four inch, a fourteen-inch and a twelve-inch water main running close to the property, these were low pressure lines. In order to provide a sufficient amount of water to a subdivision on the Vinson property, pumps in the homes or a large community water facility with a tower would have been necessary. The Vinson property was subject to two easements. First, there was an oil pipeline which actually traversed the property. On occasion, the pipeline had broken and flooded up to half an acre with oil. The easement holder had the right to lay, maintain, alter and remove pipes on the property. In addition there was the right of ingress and egress to construct, operate, maintain and from time to time alter and remove pipes. However, the pipes were required to be laid in such a manner *278 as not to interfere with the usual cultivation of the property or any buildings thereon. Provision was made for actual damages caused. Second, there was a water easement held by the City of Mansfield. There were two parallel water pipelines which traversed the Vinson property. The city had the right to lay additional lines, subject to the proviso that any actual damages would be compensated. In order to subdivide the Vinson property, it would be necessary to have the oil and water easements stabilized; that is, confined to one location. Even after stabilization, the easements would continue to be a burden on the property. The easement holders would have the right of access for the purposes of repair, maintenance, and replacement. In addition, the number of lots available for subdivision would be reduced since homes would not ordinarily be built over a pipeline. The following chart shows the population growth of the Mansfield urban area from 1910 to 1960: POPULATION OF MANSFIELD URBAN AREA Township (including
1910
1920
1930
1940
1950
1960
Municipal Areas)
Madison (including
24,108
32,242
41,841
47,334
59,685
73,556
Mansfield)
(Mansfield)
(20,768)
(27,824)
(33,525)
(37,154)
(43,564)
(47,325)
Mifflin
476
400
420
500
910
1,700
Washington
766
750
790
820
1,200
3,600
Springfield (including
900
850
1,000
1,500
2,000
4,200
Ontario)
(Ontario)
( - )
( - )
( - )
( - )
( - )
(3,049)
Troy (including
900
900
1,000
1,100
1,400
1,900
Lexington)
(Lexington)
(654)
(634)
(614)
(713)
(739)
(1,311)
Monroe
40
50
50
60
70
100
Jackson
80
80
90
95
130
200
Franklin
160
150
160
180
500
250
Weller
80
100
110
120
130
150
TOTAL
27,510
35,522
45,461
51,709
65,725
85,656
*279 The fair market value of the Vinson property on November 17, 1956, was $240,000. Opinion The Vinson property was valued at $157,000 in the estate tax return. In the notice of deficiency respondent increased the value by $740,422 or to a value of $897,422. It is difficult to find the respondent's determination to have been other than arbitrary. If we disregarded all of petitioner's evidence, which we do not, and gave full credence to the testimony of respondent's expert witness, which we do not, the highest valuation for which there would appear to be the slightest shade of basis is $492,715, the amount testified to by respondent's expert. In his reply brief, respondent continues to be "of the opinion that the real estate in question has a value as set forth in the statutory notice but acquiesces in the value placed upon the property by his expert appraiser." Experts certainly can differ on values; however, in this record, there is not even a suggestion as to where the figure of $897,422 came from. True, petitioner's witnesses established a value in excess of $157,000; however, there was at least a plausible reason for using the reported value, it being the amount for which *280 the property was appraised by three appraisers appointed by the Richland County Probate Court. Respondent presented Jack R. Balliett as an expert in the real estate and appraisal field with experience as a subdivider. His appraisal has been given little weight because of the factors which we will presently set forth. As to his experience as a subdivider, the evidence shows that this experience was gained from approximately 1923 to 1932. Even during this period of time, there was only one subdivision where he did any substantial amount of work other than selling. Balliett appraised the Vinson property by using what he called "comparable sales." His valuation was broken down as follows: Main House and 10 acres
$ 55,000
Parcel A [1] (243.21 acres) at $1,500
per acre
364,815
Parcel B (40.5 acres) at $800 per acre
32,400
Parcel C (135 acres) at $300 per acre
40,500
Total
$492,715
Balliett appraised the house at $40,000 and added $15,000 or $1,500 per acre for the land. He made no attempt to assign a specific ten acres to the house or determine *281 how much frontage, if any, would be on Cook Road. In his written appraisal, Balliett listed thirty-three sales that occurred between 1953 and 1962. Balliett testified that in arriving at his valuation he considered all of the sales listed. However, he then testified that of the thirty-three sales listed, fourteen, the sales of individual lots, were not comparable to the Vinson property. Furthermore, he testified that six additional sales of acreage were not comparable. Neither Balliett's written appraisal nor his testimony gives any indication as to what adjustment was made, if any, or to what extent his judgment was influenced by these admittedly non-comparable sales. Putting this dilemma aside for the moment, it is admitted that all the Vinson property does not have the same value. However, there has been no comparison of any sale to a particular parcel. There is no indication as to how the sales listed by Balliett were used to reach different prices for the different parcels. There is no indication that Balliett gave any consideration to the size of the Vinson property in arriving at its fair market value. Yet, he testified that the property was sufficiently large that it would *282 probably take several purchasers to dispose of it. In addition, he was of the opinion that it would take "not less nor not more than three years' time" to sell all the property. Balliett gave no consideration to the water and oil pipeline easements. In fact, he was unaware that the oil pipeline easement existed. Balliett admitted that frontage on roads was an important factor. However, he was under the erroneous impression that the Vinson property had 7,000 feet along Cook and Trimble Roads when in fact there was only 5,652 feet. Just how much weight was given this factor we are unable to determine. Balliett listed a sale in 1953 from Amy Douglas to Edward Getz as a comparable sale to the Vinson property. Here again Balliett's lack of knowledge as to frontage appeared. In his appraisal, he stated the property, which consisted of approximately 38.23 acres, had a "small frontage." In point of fact, it had a ratio of 22 front feet per acre. This is to be contrasted with Balliett's breakdown on the Vinson property: Front feet
Balliett's Parcel
per acre
Parcel A
21
Parcel C
3.4
Parcel B
0
Average of the entire Vin-
son property
13.3
Apparently, one of *283 the most comparable sales in the area was made on October 22, 1954. On that date Arthur Courtney sold Leonard Hautzenroeder a tract of land containing 110.5 acres for $40,000 or approximately $362 per acre. Although the land was contiguous to the Vinson property, Balliett rejected it as a comparable sale. The basis of Balliett's rejection was that the price was too low because Courtney was sick at the time of the sale and Courtney's son and daughter did not want to make the sale. This was despite the fact that Courtney was an officer of a savings and loan institution and was most likely well aware of real estate values. In addition, it is difficult to see what the significance of the son's and daughter's opinion is, especially when there was no evidence to indicate they had any more knowledge as to the value of the property than their father had. Petitioner's witness, Free, used this property as a comparable sale but adjusted the price upward to take into account time and other factors. On December 7, 1954, R. Ridenour sold a parcel of land containing 72.12 acres to G. Schonauer and G. W. and E. J. Miels for $40,000 or approximately $550 per acre. Balliett considered this property *284 comparable to the Vinson property but decided the price was too low because Ridenour was under pressure to sell by his bank. The basis for this latter assumption was a statement that Ridenour was supposed to have made to Balliett's partner who in turn purportedly related the information to Balliett. Aside from the hearsay nature of this information, both Ridenour and his accountant unequivocally denied that the bank was pressing Ridenour to make a sale. In fact, the accountant pointed out that it was about this time that the bank loaned him $135,000. Balliett also failed to take into consideration certain conditions which might have caused a purchaser to pay more than the actual fair market value for property. For example, a sale of land to a subdivider where he was subdividing the adjacent property or the sale of land to a person who owns the adjacent property which contains an expensive home. About the most that can be said for Balliett is that he submitted a written appraisal and testified in this case. He submitted some background material, 33 sales, 20 of which were admittedly not comparable, and a division of the Vinson property into four parts with an assigned value to each, *285 with no correlation between sales and his appraisal. Under the circumstances, we attach little or no weight to his valuation. Petitioner's witness Free was eminently qualified as an expert. [2] He presented an appraisal which was much more realistic and reliable than that of Balliett. *286 Respondent has attacked Free's appraisal on the ground that Free was from Cleveland, some 60 to 70 miles from Mansfield, and was not intimately familiar with the Mansfield area. It is true that a person who lives in an area will most likely be more familiar with it; however, this does not mean that no one else is qualified. Free had previously done some appraisal work in the area. Furthermore, Free hired a Mansfield man specifically for the purpose of helping him gather factual information upon which to base his appraisal. As between Balliett and Free, it appeared that Free had a better knowledge of the area and its economics than Balliett, the home town man. For purposes of valuing the Vinson property, Free, like Balliett, divided the Vinson property into four parts. One section consisted of the main house and its attendant buildings. Parcel 1-south contained 75 acres and was located completely to the south of Cook Road. [3] Parcel 1-north contained approximately 168 acres and was located to the north of Cook Road and was the easterly half of the property. [4] Parcel 2 was the westerly portion of the property which contained 175.5 acres. [5]
*287 Free agreed with Balliett that at least ten acres of land should go with the main house. However, Free went further than Balliett and designated a specific ten acres having a frontage of 540 feet on Cook Road. Free appraised the main house and ten acres at $60,000. The basis of his appraisal was a piece of property sold on July 20, 1956, by O. and A. Henkle to James C. Gorman, III, for $55,000. Free compared such matters as the amount of land, the neighborhood, age of property, number of rooms in the main house, porches, kitchens, number of baths, garages, maid's quarters, attendant buildings, and condition of the property. After taking into consideration all these factors and especially the fact that the Henkle property had more land but the Vinson property had more in the way of other buildings, Free came up with a net adjustment of $5,000, or a total fair market value of $60,000. Free considered over 100 sales before deciding on a group of comparables. He divided the comparable sales into two groups. The first category contained 10 sales which were used to value Parcel 1-north (168 acres) and Parcel 1-south (75 acres). The second category contained 5 sales which were used *288 to value Parcel 2 (175.5 acres). From the table in the margin, [6] it will be noted that Free considered as comparable nine sales over 50 acres. Four of these sales were considered comparable to the better 243 acres (Parcel 1-north and Parcel 1-south) of the Vinson property. (Two (#1 and #7) were also considered by Balliett). One of these was the sale from Courtney to Houtzenroeder (#1), discussed supra, containing 110.5 acres $362for per acre. The second of these sales (#7) was the one from Ridenour to Schonauer and Miels, discussed supra, consisting of 72.12 acres which sold for $554 per acre. The third sale (#5) of more than 50 acres, was made in 1956 for $738 per acre. The property contained 54.23 acres. The fourth sale contained 75.64 acres and was made in 1957 for $595 per acre. *289 Free considered the remaining five sales of over 50 acres as being comparable to the westerly 175.5 acres of the subject property. These sales ranged from 61 acres to 246 acres, occurred in the years 1953 through 1957, and were at prices of $202 to $435 per acre. One of these sales was of the largest amount of acreage of any sale referred to by any witness, being a sale of 246 acres at $307 per acre. Free then took a second step in his analysis. In connection with each sale, he took into consideration such factors as the general location of the property, i.e., closeness to the subject property or a reference to whether location was deemed better or worse than the subject property; the ratio of front feet to acreage; topography, availability of utilities; and whether or not the purchase price was financed. These additional factors, together with time of sale and size of parcel sold, were used in relating the sale price to the subject property. Free then determined whether each of those factors pointed to a higher or lower valuation for the subject property as compared with the particular sale. For example, the Courtney property was immediately adjacent to the Vinson property. The *290 general location and its time of sale were both considered to be factors requiring an adjustment upwards from the $362 per acre sale price, whereas the special financing and higher ratio of front feet per acre both required a downward adjustment from the $362 per acre sale price. After considering the adjusting factors, Free concluded that a value of $500 per acre was indicated for Parcels 1-north and 1-south as of November 17, 1956. This process was used for each sale listed in Free's appraisal report. Free's adjusted figures for the sales which he related to Parcels 1-north and 1-south ranged from $500 to $900 per acre. The median of Free's adjusted prices was $700 per acre, and the arithmetic mean of his adjusted prices was $665 per acre. Free's tentative valuations of Parcels 1-north and 1-south were $650 per acre and $750 per acre, respectively. With respect to the sales data which Free related to Parcel 2 or the westerly portion of the subject property, the median of Free's adjusted sales prices was $250 per acre and the arithmetic mean of his adjusted prices per acre was $252. This compares with Free's tentative valuation for that 175.5 acres of $250 per acre. Free carefully *291 explained that his tentative appraisal figures of $650 per acre for Parcel 1-north, $750 for Parcel 1-south, and $250 for Parcel 2, had to be adjusted for (1) easements, and (2) the size of the entire 418-acre prospective subdivision property. Free assumed that it would cost nothing in the way of payments to the easement holders to stabilize the oil and water easements, although he conceded that time and other expenses would be lost in effecting the necessary stabilization. He estimated that engineering and other costs incident to stabilization and detriment on account of easements would be $16,000. Free's analysis of market data and his relationship of that data to the subject property were devoted to arriving at separate, independent, tentative valuations of Parcel 1-north as though it stood alone, of Parcel 1-south as though it stood alone, and of Parcel No. 2 as though it stood alone. Having done that, however, Free recognized that he had valued three separate parcels, whereas his task actually was to value 418,708 acres in the aggregate. [7] Free then took into account the overall size of the Vinson property and the difficulty which might result in trying to dispose of such a *292 large tract of land. Accordingly, he adjusted his tentative valuations of the separate parcels by $13,700 on account of the size. Free's final valuation figure of $239,600 was arrived at in the following manner: Main House and 10 acres
$ 60,000
Parcel 1-north - 168 acres at $650
109,200
Parcel 1-south - 75 acres at $750
56,200
Parcel No. 2 - 175 acres at $250
43,900
Total tentative valuation
$269,300
Less adjustments: Easements
$16,000
Size
13,700
29,700
Final valuation figure
$239,600
Petitioner's witness Warner was a real estate broker in Mansfield. While he had little in the way of appraisal experience, his general knowledge of subdivision successes, failures and experiences in the area help to corroborate Free's appraisal. Warner valued the Vinson property, exclusive of the house and ten acres at $154,025. Based on the record before us, we hold that the fair market value of the Vinson property on November 17, 1956, was $240,000. Decision will be entered under Rule 50. Footnotes
1. Parcel A was comprised of 75 South and 168 East. Parcels B and C were the total acreage comprising 175 West.↩
2. Free has been engaged in appraisal work for approximately 29 years. He is a member of the Cleveland Real Estate Board; the American Institute of Real Estate Appraisers; the Society of Residential Appraisers; and the American Right-of-way Association. He has held offices in each organization except the American Right-of-way Association. Since 1946, Free has been teaching night classes in appraising at Western Reserve University. Since 1949, he has been teaching different appraisal courses sponsored by the American Institute of Appraisers. These latter courses are given at different universities around the country. Free has also written articles for the Journal of the American Institute of Real Estate Appraisers and Society of Residential Appraisers. In 1955, he wrote a book entitled "Problems in Real Estate Appraisal" which is used in teaching courses in appraising. In 1958, Free was asked by the Appraisal Institute to revise and edit a book called "Appraisal of Real Estate." This book is a standard appraisal book used in the field by both the Institute and colleges.↩
3. Referred to as 75 South in the findings of fact. ↩
4. Referred to as 168 East in the findings of fact. ↩
5. Referred to as 175 West in the findings of fact.↩
6. ↩
Total
Free's Comparable
Num-
Sales as Listed in
ber of
Average Price
Sizes of Tracts
His Appraisal
Acres
Total Price
per Acre
Over 200 acres
Sale # 4
246+
$ 75,500
$307
150-200 acres
None
100-150 acres
Sale # 1
110 1/2
$ 40,000
Sale #12
145.6
40,000 (incl.
bldgs.)
256.1
$ 80,000
$312
75-100 acres
Sale # 8
84.26
$ 17,000
Sale #14
75.64
45,000
Sale #10
76.13
20,000
236.03
$ 82,000
$347
50-75 acres
Sale # 5
54.23
$ 40,000
(incl.
bldgs.)
Sale # 7
72.12
40,000
Sale #13
61
26,500 (incl.
bldgs.)
187.35
$106,500
$568
25-50 acres
Sale # 3
32.01
$ 32,000
Sale #11
30.75
28,000
62.76
$ 60,000
$956
Less than 25 acres
Sale # 2
23.4
$ 15,000
Sale # 9
22.82
23,000
Sale #15
7.74
11,500
Sale #15
7.16
11,000
61.12
$ 60,500
$990
7. Excludes ten acres attributable to the main house.↩